Christian J.
delivered the opinion of the court.
This is an appeal from a decree of the circuit court of Pittsylvania. The material facts disclosed by the record are as follows: Henry Robertson by his will, admitted to probate and record in the county court of Pittsylvania on the 15th October 1860, made the following devise: “It is also my will and desire, that my executors hereafter named shall, as soon as convenient to them after my death, divide my landed estate into three different tracts as follows: the mill tract, as per the survey from C. W. Ward; the home tract and the William Fowler tract to compose one lot; and the gold mine tract, as purchased by my brother E. O. Robertson, the other lot; and sell the said three tracts of land at public auction, upon such terms as they may deem best for the interest of my legatees.” These legatees were his children, who were all infants, and who were to share equally in the proceeds of said sale. John D. Glenn and Crispin Dickenson were appointed his executors. The former declining to qualify, Dickenson alone undertook the execution of the will. He sold the land in different lots, as directed by the testator. The sale was made on the 12th November 1860, on a credit of six and twelve months; so that the bonds became due respectively on the 12th May 1861 and November 12, 1861. The aggregate amount of these land sales was $5,240.61: the sale of *272 personal property, amounting to nearly $2,000, was made on the same day, upon a credit of six months* except for sums under five dollars.
The executor settled no account of his administration of his testator’s estate until after the close of the war; and everything which he did in that direction before this suit was brought was to return an inventory and account of sales of his testator’s estate, real and personal.
The debts of the testator seemed to be inconsiderable, and were all paid in 1860, 1861 and 1862. But not a dollar was ever paid over by the executor to the legatees.
In December 1867 these legatees, three of them still being infants, filed their bill in the circuit court of Pittsylvania, calling upon the executor for a settlement of his transactions as executor, and the payment to them of whatever remained of their father’s estate after payment of his debts. This bill after setting out the will of the testator, the sale by the executor of the real and personal estate in 1860, and the debts due to the testator, charged that “when the executor was called on to settle his account with complainants and their proper guardians, he refused to do so, alleging that the purchase money for the real and personal estate, as well as the evidences of debt mentioned aforesaid, were not collected by him until late in the year 1864, and were collected in confederate treasury notes, which became by the issue of the late war entirely worthless; and that the executor has settled before a commissioner of the county court of Pittsylvania an ex parte account since the close of the war, accounting for the proceeds of this large estate of his testator, which was sold when the currency was gold, or its equivalent, in confederate currency, which, scaled to its *273 gold value, reduces said estate to a mere trifle.” The bill further charges, “that if the executor chose to indulge the purchasers at the sales made by him, or chose to collect the same in 1864 in confederate money, he did it at his peril, and should be held accountable to them for it. They insist that being then infants, unable to maintain and demand their rights and watch their own interests, it was imperatively the duty of the executor to use his utmost diligence in securing and protecting their rights; that if he failed to collect the debts, when there was a standard currency in specie or its equivalent, he had no right to receive any other; but that it was his duty to secure said debts, either by good personal security or by judgment liens, for the attainment of which the courts were all the time open and available. To this bill the executor and his sureties were made parties defendant, and the prayer of the bill was, that the executor might be compelled to settle his account before a commissioner of the court, and be required to account for the proceeds of the sales made by him in such currency as said sales were made by him.
The executor answered this bill. He admitted the sales of real and personal estate, as set forth in the bill; and then says, in justification of his course in not collecting the bonds when due, and- in receiving confederate currency when so greatly depreciated:— this respondent used every effort to collect said purchase money soon after the commencement of the war as long as he remained at home, and after going into the service, he appointed an agent to collect it for him, who in 1863, and to the first of 1864, collected a portion of the same, all of which, as his said agent informs him, he has in hand now—the identical notes he collected. This respondent was in the service from *274 the time he entered it (in February 1862) until the surrender at Appomattox*, so that he could not give the his personal attention; but he appointed a discreet, prudent agent to attend to it for him, and he never used for his own purposes, either for speculation or otherwise, one dollar of the money. The said agent informed this respondent that he made repeated efforts to have said money distributed among the legatees; but such was the state of things, and the courts were so occupied with matters relative to the war, that he (as he informs this respondent) never could have it done. This respondent, finding that he could not possibly attend to his duties as executor while in the service of the country, wrote to his agent to have some one appointed in his stead, and two or three times (as he informed him) it was attempted to be done, but, from the same causes it was not effected; and after the confederate authorities passed a law compelling all creditors, under heavy penalties, to take confederate money, and not until then, did this respondent agree that his agent should collect said debts in confederate money; and this respondent collected his own debts, due to him, individually, before the war in the same currency, and, so far as he is informed, the people generally did the same, and he is advised that a fiduciary is not an ensurer of the currency of the country at any time, and, least of all, in times such as we have fallen on within the last few years, and that he will not be held liable if he acts in good faith and manages the affairs of the estate committed to his care in the same way that he and other prudent people manage their own private affairs. All the bonds, notes, &e., belonging to the estate, and not collected, are now in the hands of this respondent, and he is ready to make such disposition of them as the court may direct, and *275 to settle Ms account in such manner as to the court may seem right. He further states, that no deeds have been made to the purchasers of said lands; and this respondent submits that, under the circumstances, he should not be held responsible for the money, and be required at the same time to convey the lands to the purchasers; and if the sales are to be set aside as to anything, that they should be set aside out and out, and a re-sale directed. One of the purchasers of the land proposed to pay this respondent for the same in confederate money, when he was at home on a furlough in 1863, and on being informed that this respondent had not the papers with him, threatened to compel him to take the money under the penalties of the law, and, under the advice of counsel, it was paid to the agent aforesaid.
Upon the coming in of this answer, the court entered a decree directing one of the commissioners to take and report an account of the value of confederate money at the time the bonds for the payment of the lands sold by the executor, Crispin Dickenson, in the proceedings mentioned, respectively became due, and also the value of the currency at the time payments were made by the purchasers of said lands to the executor or his agent for said lands, and also the value of said lands in good currency at this time. The court doth further adjudge, order and decree, that said executor is properly chargeable with the bonds and other evidences of debt which came into his hands or were taken by him as executor of Henry Robertson, deceased, and filed with and referred to in commissioner Banks report, and that said executor proceed at once to collect the same. The court being further of the opinion that the parties who purchased the lands, sold by said executor, should be made parties to this suit, *276 doth order that the plaintiffs amend their hill and make such persons parties thereto.
Under this decree the plaintiff filed an amended 1)111, making the purchasers of the real estate parties-defendant.
The purchasers answer the bill, admit that they paid the purchase money in confederate currency, part in 1863 and part in 1864; but claim that having fully paid the purchase money to the executor who was authorized to receive it, they are entitled to have the lands conveyed to them. Two of them claim that they have put valuable improvements upon the lands so purchased, and “claim the benefit of the improvements so made.”
The report of the commissioner returned under the above decree directing him to ascertain the value of the currency at the time the payments were made, shows that the larger portion of the purchase money (all of which was due in a sound currency and before confederate currency came into circulation), was paid in the year 1864, when the rate of depreciation was $27.00 for $1.00; showing that the purchaser Tosh, paid his debt of $2,685.50 due in gold, with a currency worth only $319,50, and that the purchaser Grider paid his debt of $2,404.50, due in gold, in a currency worth only $144.98, and that the purchaser Jacobs paid his debt of $512.47, in a currency worth only $18.31; or in other words, showing that the debts arising from the sale of lands of the testator devised to be sold and to be'divided among his infant children, amounting to $5,602.47, were discharged by the payment of $482.79.
The commissioner also returned a report showing thé present value of the three tracts of land sold by the executor. Upon the return of these reports of its commissioner, the circuit court at the November term *277 1871, entered its decree declaring “ that the interests ■of the legatees of Henry Robertson under his will, -all of whom were infants during the time, were improperly and grossly prejudiced and sacrificed by the executor through his agent, in receiving a currency so greatly depreciated when no necessity existed to justify the same, and also by the purchasers in paying in a greatly depreciated currency the purchase money on «aid lands, for which bonds were executed when there was no depreciation in the currency of the country, and before confederate currency was issued.” The court then decreed that unless the purchasers should ■elect within sixty days, to take the land purchased by them respectively in 1860, at the then present value reported by the commissioner, the same should be sold by a commissioner appointed for that purpose; •and that if they should elect to take the same at such value they should be credited by the gold value of the payments they made to the executor at the time such payments were made. It is from this decree that an •appeal was allowed by this court.
The court is of opinion that there is no error in this decree, so far as it holds the purchasers as well as the executor liable to the devisees of Henry Robertson for the purchase money of the lands sold by the executor. The conduct of the executor in receiving debts contracted to be paid in gold or its equivalent, in a currency depreciated to such an extent that debts amounting to $5,602.47, well secured, were discharged by the payment of $482.79, was so grossly negligent, and such a reckless sacrifice of the interests of these infants whom his testator had committed to his care and protection both as executor and trustee, as to constitute a fraud in law, and cannot be tolerated for a moment in a court of equity. His answer, upon the *278 most liberal interpretation of Ms motives and conduct,, furnishes no justification or excuse. The fact that war was flagrant and business suspended, and the-courts closed, may furnish an excuse for not bringing-suit upon the bonds he held; but can furnish none-for his receiving gold debts well secured, in confederate money almost worthless—for instance in gjvingup a debt of upwards of 500 dollars for 18 dollars.
It is not true, as asserted in his answer, that there was any “law compelling all creditors, under heavy penalties, to take confederate money.” Ho such law existed. The statute in respect to a tender of confederate money applied only to a case where the contract of the parties was to be fulfilled or performed in confederate treasury notes. It had no reference, and could have none, to debts contracted for gold or its equivalent, and before the existence of confederate-currency. There is and can be no justification or excuse for an executor guilty of such gross negligence- and palpable fraud in law as is shown in this case.
And now the question is, did the purchasers, in failing to pay these debts when they became due in May and Hovember 1861, and in insisting on paying them in 1868 and 1864 in an almost worthless currency, participate in the devastavit of the executor and the breach of trust committed by him, so as to make them liable-to the infants, whose lands they got, but never paid for? ¥e think they did. We do not mean to say,, that in every ease where an executor may be held liable, as committing a devastavit, for collecting a good-debt, well secured and payable in gold, in a depreciated currency, that the party who pays the debt is necessarily liable as participating in such default or fraud of the executor. On the contrary, there may be cases where the collection of a debt in a depreciated cur *279 rency would be a devastavit in the executor, and yet no liability- is fixed upon the party who pays the debt. He, the debtor, does not know, and is not, bound to inquire, what may be the necessities of the estate represented by the executor. For aught he knows, the debt which he pays may pay a debt due from, the estate, or pay a legacy which a legatee may be willing to receive in a depreciated currency. But this is not the case before us. Here is not the case simply of the collection of a debt due to the testator and collected by the executor, but the dealing is directly between the executor and these defendants as seller and purchaser, vendor and vendee.
These defendants are in default in not paying the bonds when they became due in the currency which they agreed to pay, and in paying to the agent of the executor a worthless currency for the land of these infants, for which they agreed to pay gold. In other words, they hold the lands of these infants, for which they have not paid one tenth of their value. They have taken in and cancelled these bonds, amounting to upwards of $5,000, by paying to the executor something over $400. Suppose the executor had sold these bonds—for instance, suppose he had sold Jacobs’ bond of $500 for $18, would not both seller and buyer have been held liable for so gross and palpable a fraud? Pinckard v. Woods, 8 Gratt. 140; Jones’ ex’or v. Clarke, 25 Gratt. 642. Practically this was just what was done. Jacobs paid but $18 for his obligation of $500; and both he and the executor must be held liable for the gross fraud upon the rights of these infants, in which both participated.
We are therefore of opinion that there is no error in the decree of the circuit court directing a sale of the land, unless the purchasers elect to pay for the *280 same the value of the same ascertained by the commissioner ; this court being of opinion that the facts proved are such as clearly to charge the executor with a devastavit and breach of trust, and the purchasers with participation in and responsibility for the same.
The court is further of opinion that there is no error in the decree of said circuit court, as assigned in the petition of appeal, that the court failed to allow the purchasers for the improvements put on the land.
Certainly there is no error to the prejudice of the appellants. No interest is charged against the appellants in these debts due since November 1861, and they are not required to account for rents and profits. These (interest and rents) would more than overbalance all the claims asserted for improvements by the appellants.
It is manifest that upon a settlement of accounts charging the purchasers with the interest or the rents and profits since November 1861, and crediting them with all the improvements they claim, they would be indebted to the appellees in a much larger amount than that decreed against them. If they elect to hold as purchasers, then they would be charged with interest. If they give up the purchase, they should be chargeable with rents and profits, which, in either ease, would overbalance the improvements claimed.
Upon the whole case we are of opinion to affirm the decree of the circuit court.
Decree affirmed.